**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

QUANTUM LOYALTY SYSTEMS, INC., :
and QUANTUM CORPORATION OF :
NEW YORK, INC., :
 :
  Plaintiffs, :
 :
  v. : Civil Action No. 09-022-RGA-MPT
 :
TPG REWARDS, INC., :
 :
  Defendant. :
 :

**REPORT AND RECOMMENDATION**

## I. INTRODUCTION

This is a patent infringement case.  On January 1, 2009, Quantum Loyalty

Systems, Inc. ("QLS") and Quantum Corporation of New York, Inc. ("QNY") (collectively,

"Quantum" or "plaintiffs") filed suit against TPG Rewards, Inc. ("TPG" or "defendant")

alleging infringement under 35 U.S.C. § 271 of Quantum's U.S. Patent No. 7,337,949

("the '949 patent").[1]

On April 9, 2012, the parties submitted a Joint Claim Construction Chart

("JCCC"),[2] claim construction briefing commenced June 6, 2012,[3] was completed July 2,

2012,[4] and the court conducted a *Markman* hearing August 3, 2012.  This order sets

---

[1] D.I. 1.  Plaintiffs twice amended their complaint, but the '949 patent remains the patent asserted in this matter.  D.I. 32 (Apr. 17, 2009, First Amended Complaint); D.I. 144 (Aug. 22, 2011, Second Amended Complaint).
[2] D.I. 245.  On August 15, 2012, the parties filed a document titled "Joint Submission of Parties' Claim Construction Positions from August 3, 2012 Hearing" in which some of their proposed constructions were modified from those contained in the JCCC as a result of discussions during the *Markman* hearing. D.I. 314.
[3] D.I. 294 (Plaintiffs' Opening *Markman* Brief); D.I. 292 (Defendant's Opening Claim Construction Brief).
[4] D.I. 299 (Plaintiffs' Responsive *Markman* Brief); D.I. 301 (Defendant's Rebuttal Claim Construction Brief).

forth the court's recommendations of constructions for disputed claim terms discussed in briefing and at the *Markman* hearing.

## II.    BACKGROUND OF THE INVENTION

The '949 patent is based on an application that is a continuation of the application that issued as U.S. Patent No. 7,156,294 ("the '294 patent") which, in turn, is a continuation of the application that issued as U.S. Patent No. 7,066,383 ("the '383 patent").[5]

The '949 patent, titled "System for Marketing Leisure Activity Services Through Prepaid Tickets," relates to:

> marketing and distributing services, especially participatory sports or entertainment services, by collecting a prepayment and issuing to a customer a ticket or similar indicia that can be redeemed for a particular service.  The service is one that can be obtained at the customer's option from any of a plurality of distinct service providers, including providers that normally charge more or less than others for the particular service involved.  The invention further involves accounting for the usage and payment for services on this basis.[6]

The specification includes an embodiment of a prepaid services system having "seven primary parties":  (1) the seller of the ticket; (2) the purchaser of the ticket; (3) the ticket user; (4) the ticket information manager; (5) the service provider; (6) the financial network; and (7) the ticket program manager,[7] and describes the interactions among those parties.  "[A] ticketing program manager 95 . . . enlists a plurality of providers 80 of one or more substantially comparable services."[8]  "The ticketing program manager 95

---

[5] The three patents have substantially identical specifications.
[6] '949 patent, 1:16-25.
[7] *Id.*, 6:6-11, FIG. 1.
[8] *Id.*, 6:12-18.

negotiates . . . with the providers to honor the one-time-use ticket 40[;] . . . to accept the ticket in exchange for provision of the provider's regular services and to seek remuneration for such services from the system maintained by or for the ticketing program manager."[9]  "The ticketing program manager sets the price charged by seller 20 for sale and activation of the ticket, so as to accommodate variations in actual service provider prices."[10]  "After the service provider relationships have been established (step 100) or while that is occurring, the ticketing program manager 95 establishes relationships with existing sales outlets (step 110) who will sell the one-time-use tickets."[11]  "The sellers 20 have point of sale terminals 50 connected to an existing network 60 that will allow fast, efficient communication with the ticket information manager 70."[12]  "Once relationships with the sellers 20 and service providers 80 are established, the ticketing program manager distributes one-time-use tickets (step 120.)"[13]  "At step 130, the purchaser 30 selects a gift ticket for purchase and pays the seller 20 some agreed purchase price 31."[14]  "At step 131, the seller 20 activates the ticket, preferably including transmitting an identification code that is or becomes associated with

---

[9] *Id.*, 6:18-24.  "In this exemplary illustration of the invention, plural service providers 80 all provide at least one same stated service or article of goods, for example a round of golf, a day's worth of skiing or treatment at a health spa or the like."  *Id.*, 6:43-46.

[10] *Id.*, 7:7-9.  "[T]he ticket selling price should be set and/or periodically adjusted so that the use of the tickets integrated over all the users and providers, has a sufficient surplus selling price over the average cost of the service (which may or may not be the same as the average provider price, given that users may frequent certain providers more than others), to provide at least a modest return on investment to the ticketing program manager."  *Id.*, 7:25-32.

[11] *Id.*, 7:46-50.

[12] *Id.*, 7:50-53.  "This communication is desirable for the transfer of the information required to initialize a ticket once it has been purchased."  *Id.*, 7:53-55.

[13] *Id.*, 8:25-27.

[14] *Id.*, 9:24-26.

the ticket (e.g., is at least partly read from or written onto the ticket)."[15]  "Other

information is also preferably recorded, including at least the purchase price and the date

of the sale transaction (step 132)."[16]  "The ticket information manager preferably

acknowledges by communication back to the seller that the ticket is valid and now has

been initialized (step 133), although the acknowledgement can be deferred or

accomplished off line."[17]  "The seller 20 then accepts payment 31 from the purchaser 30

(who might or might not be the ultimate ticket user)."[18]  "At some point, the seller 20

transfers payment 21 to the ticketing program manager 95, preferably through a financial

network 90 such as a credit card network."[19]  "The payment 21 to the ticketing program

manager (or it's [sic] escrow account) is the payment tendered, less a portion of the sale

price that is due to the seller (step 134) in consideration of making the sale."[20]  "Once a

customer has purchased a ticket, the ticket may be used by the purchaser 30 or by

someone to whom the purchaser has conveyed the ticket, for example as a premium or

as a gift for redemption, etc."[21]  "A ticket user 35 presents the ticket to a service provider

at step 150 in order to redeem the indicated service."[22]  "At step 151, the service provider

preferably verifies the validity of the ticket by data transfer with the ticket information

---

[15] *Id.*, 9:30-33.  "The identification code is at least substantially unique to the ticket and is transmitted over the existing communications network 60 to the ticket information manager 70 or to a data store associated with the ticket information manager 70."  *Id.*, 9:33-37.
[16] *Id.*, 9:46-48.
[17] *Id.*, 9:48-52.
[18] *Id.*, 9:53-54.
[19] *Id.*, 9:54-57.
[20] *Id.*, 9:67-10:3.
[21] *Id.*, 10:23-26.  "Inasmuch as the user 35 might or might not be the same party as the purchaser 30, for the purpose of this description, the term 'user' should be construed to encompass an initial purchaser or anyone to whom the purchaser has conveyed the ticket."  *Id.*, 10:28-32.
[22] *Id.*, 10:33-34.

manager 70 over the communications network 60."[23]  "As a first check, the ticket

information manager will verify that the service provider is among those who have

agreed to accept the tickets.  (Step 152)."[24]  "The unique identification code associated

with the ticket is then transmitted to the ticket information manager."[25]  "At step 153, the

ticket code is compared with a list of codes stored in a database maintained by (or for)

the ticket information manager, namely a list of valid ticket codes for initialized but as-

yet-unused tickets."[26]  "If the ticket code is valid and the ticket has not yet been used, the

ticket information manager returns a message to the service provider . . . that the ticket

is valid, indicating that the user may redeem a single use of the service provider's

services . . . ."[27]  "The ticket information manager then records data referenced to the

ticket code to represent that the ticket has been used, so that the ticket may not be used

validly again (step 154)."[28]  "Finally, the ticket information manager sends a notification to

the financial network that a ticket has been redeemed, at which point the financial

network provider transfers payment 81 from the ticketing program manager's account to

the service provider's account.  (Step 155)."[29]  "At step 160, after the system has been in

---

[23] *Id.*, 10:34-37.

[24] *Id.*, 10:44-47.

[25] *Id.*, 10:52-54.

[26] *Id.*, 10:54-57.

[27] *Id.*, 10:57-62.  "If, at step 153, the ticket information manager determines that the ticket does not have a valid identification code, or has a code for a ticket that has already been used once, then a message is returned to the service provider indicating that the ticket is not valid and that the service provider should not accept the ticket as payment for services.  A similar message would result if, at step 152, the ticket information manager does not recognize the service provider as one who has agreed to participate in the prepaid leisure activity services system."  *Id.*, 11:51-60.

[28] *Id.*, 10:64-67.  "By communicating to the service provider 80 that the ticket is valid, the ticket information manager 70 basically indicates that the ticketing program manager 95 will remit payment 81 to the service provider 80 the purchase price of the service for which the ticket user 35 has presented the ticket."  *Id.*, 11:1-6.

[29] *Id.*, 11:15-20.  "It will be recognized that the separate functional blocks depicted in FIG. 1 as ticket information manager 70 and ticketing program manager 95 may be performed by the same entity.  It should be recognized that an escrow account ca[n] be maintained either by the ticketing program manager

operation for some period of time, the ticketing program manager can compare and reconcile any overage/underage on proceeds received on tickets presented for higher or lower priced service providers and/or sold by sellers with higher or lower markups, and adjust pricing and payment strategies or provider membership arrangements, if necessary."[30]  "In another embodiment of the invention, the purchasers or ticket users are provided a capability to add a limited amount of incremental value to the ticket (an upgrade) either at time of purchase or at any time after purchase and prior to redemption of the ticket for services (step 140)."[31]

## III.   CLAIMS-AT-ISSUE

Quantum alleges TPG infringes claims 1, 2, 3, 4, and 9 of the '949 patent.  Those claims recite:

'949 patent, claim 1

1.  A method for providing a payment mode for services, comprising the steps of:

(a) providing service specific payment modes, each payment mode possessing a substantially unique identifier and representing an initial value to be remitted for use of a desired service, each said payment mode configured to be valid for incremental quantity of services at any one of a plurality of service providers; and

(b) enabling a variable rate redemption of the payment mode for service provided by one of the plurality of service providers, by:

allowing a user to select one of the service providers among the

---

as depicted in FIG. 1 or by the financial network 90 on behalf of the ticketing program manager."  *Id.*, 11:43-50.

[30] *Id.*, 12:5-12.

[31] *Id.*, 12:25-29.  "In the case where a ticket can have additional incremental value added, part of step 153 would include not only verifying that the ticket is valid, but determining the total value of the ticket.  Again, the ticket's value as seen by a user is not intended to be in monetary units, but incremental credits."  *Id.*, 14:38-43.

plurality of service providers for redemption in exchange for a unit use of a desired service from said selected provider;

at the selected service provider, debiting a price set by the selected service provider for the desired service, wherein price debited for said service by at least certain of said service providers being able to be different from price debited by others of said service providers for similar service, such that the payment mode is redeemable at a variable rate among the plurality of service providers for similar service; and

effecting payment at the price debited for said service by said selected service provider.

2. The method of claim 1, wherein the payment mode is redeemable for a certain service from the selected service provider, as opposed to a cash sum.

3. The method of claim 1, further comprising the steps of absorbing any differences in prices debited by the plurality of service providers for similar service, and optionally adjusting price of the payment mode redeemable for the service.

4. The method of claim 1, wherein the payment mode is configured for data transfer over a communications network capable of recognizing the unique identifier, the communications network including any of a credit card network, a debit network, and a financial transaction network.

9. The method of claim 1, wherein the payment mode is valid for redemption for a limited period of time and further comprising the additional step of the service provider's verifying an expiration date of the payment mode.

TPG asks the court also to construe two terms from the claim 1 of the '294 patent as part of its nonstatutory obvious-type double patenting defense. That claim recites:

1. A method for provision of prepaid services, comprising the steps of:

(a) providing service specific tickets, each ticket being valid for incremental quantity of services at any one of a plurality of service providers, incremental quantity being measured in terms of number of times of use of the ticket; and

(b) enabling a variable rate redemption of the ticket for service

provided by one of the plurality of service providers, by:

allowing a ticket-holder to select one of the service providers among the plurality of service providers for redemption in exchange for a unit use of a desired service from said selected service provider;

upon presentation of the ticket by the ticket-holder to the selected service provider, debiting a price set by the selected service provider for the desired service, wherein price debited for said service by at least certain of said service providers being different from price debited by others of said service providers for the same said service, such that the ticket is redeemed at a variable rate     among the plurality of service providers for said same service;

effecting payment at the price debited for said service by said selected service provider; and

absorbing any differences in prices debited by the plurality of service providers for the same service, and optionally adjusting price of the ticket redeemable for the service.

## IV.   CLAIM CONSTRUCTION

The court determines the disputed claim language in asserted claims of the patent-in-suit (and two terms from the '294 patent), as identified by the parties, shall be construed consistent with the tenets of claim construction set forth by the United States Court of Appeals for the Federal Circuit in *Phillips v. AWH Corp.*,[32] as follows:

1.    *payment mode* ('949 patent, claims 1-4, 9); *ticket* ('294 patent, claims 1, 2)

Quantum's proposed construction for payment mode is:  "a particular type or form of doing something; a manner of acting or doing; a method; a way of presenting payment, for example by presenting a substantially unique identifier or a physical instrument bearing or including the substantially unique identifier, but excluding payment

---

[32] 415 F.3d 1303 (Fed. Cir. 2005).

8

by check."[33]  Quantum contends "ticket" means:  "anything evidencing that a fare or admission fee has been paid or promised to be paid."

TPG proposes that both "payment mode" and "ticket" be given the same meaning: "an item which may be redeemed as payment for a service, but has no fixed monetary value to the user, and is sold to a customer."[34]

The term "payment mode" does not appear in the specification of the '949 patent; it appears only in the claims.  Nor does the term appear anywhere in the '383 or '294 patents.  On June 26, 2007, the examiner issued an office action rejecting the claims of the '949 patent application "on the ground of nonstatutory obviousness-type double patenting as being unpatentable over" certain claims of the '294 patent.[35]  The examiner stated "[a]lthough the conflicting claims are not identical, they are not patentably distinct from each other because both applications claim the same method for provision of prepaid services and prepaid services account management system."[36]  On July 20, 2007, in response to that office action, the patentee amended the '949 patent application claims by substituting, *inter alia*, "providing a payment mode for services," in place of "provision of prepaid services," in claim 1, and "payment mode[s]," in place of "ticket[s]," in each of the claims that previously recited "ticket[s]."[37]  After that amendment, the

---

[33] The portion of Quantum's proposed construction reading "a particular type or form of doing something; a manner of acting or doing; a method; a way" are alternative definitions of the word "mode" contained in Quantum's claim construction submissions.  *See* D.I. 300 (Albert Decl. Ex. N, dictionary definition of "mode").

[34] In the JCCC, and in briefing, TPG had proposed construing "payment mode" to mean:  "a ticket which has no fixed monetary value, and is sold to a customer."  D.I. 245 at 3; D.I. 292 at 7.  At the *Markman* hearing, TPG advised it was proposing "an item which may be redeemed as payment for a service, but has no fixed monetary value to the user, and is sold to a customer" for "payment mode," as well as, "ticket."  Tr. 58:23-59:8 (Transcript of the August 3, 2012 *Markman* hearing).

[35] D.I. 295, Ex. D at QLS0397950.

[36] *Id.*, Ex. D at QLS0397950.

[37] *Id.*, Ex. D at QLS0397939-QLS0397946.

9

examiner issued a Notice of Allowance.[38]

TPG contends that, because "payment mode[s]" replaced "ticket[s]" through amendment of the claims, "the specification of the '949 patent provides no support for ['payment mode'] other than a 'ticket, which has no fixed monetary value.'"[39] It maintains the "specification does not describe anything other than a ticket, and such ticket is not denominated in a monetary value."[40] TPG maintains "[t]o satisfy 35 U.S.C. § 112, ¶ 1, claims can be no broader than the supporting disclosure."[41] TPG argues "[b]ecause the specification and only embodiments of the '949 patent disclose a 'ticket . . . that is denominated not in a monetary value' the Court should adopt TPG's proposed construction."[42] TPG also contends the patent makes clear that the tickets are sold to a customer.[43]

Quantum contends TPG's inclusion of "no fixed monetary value" and "is sold to a customer" improperly imports limitations from the specification into the claims. Quantum also disputes TPG's assertion that the "payment mode" and "ticket" claimed in the '949 and '294 patents should be construed such that each term has the same meaning. Quantum argues that, as noted above, after "ticket" was deleted and replaced with "payment mode" during prosecution, the examiner entered the amendment and issued a Notice of Allowance in the next communication. Quantum concludes the examiner specifically considered and rejected the same argument TPG presents here: that the

---

[38] *Id.*, Ex. D at QLS0397913-QLS039720.
[39] D.I. 292 at 7-8.
[40] *Id.* at 9.
[41] *Id.*
[42] *Id.*
[43] *Id.*

10

"payment mode" claimed in the '949 patent is the same thing as the "ticket" claimed in the '294 patent.  In Quantum's view, "payment mode" is a broader term than "ticket."

The court agrees with Quantum that "payment mode" is a broader term than "ticket."  Although the substitution of "payment mode" for "ticket" during prosecution was not the only amendment made to the claims of the '949 patent to overcome a double patenting rejection, in the court's view, it was a substantive change supporting Quantum's contention that the two terms have different meanings; a contention further supported by the specification.  The specification contradicts TPG's argument that those terms must be understood to be interchangeable by using "ticket" merely as an example: "[i]t would be advantageous if a convenient arrangement could be organized whereby different potentially-competing suppliers of services can all honor *a coupon or gift ticket or similar indicia of value* that is denominated not in a monetary value but as as [sic] a particular service."[44]  There, the specification uses "ticket" in the alternative, "a coupon *or* gift ticket *or* similar indicia of value."  That a ticket is simply exemplary is repeated in the specification which provides:

> The invention relates to marketing and distributing services, especially participatory sports or entertainment services, by collecting a prepayment and issuing to a customer *a ticket or similar indicia* that can be redeemed for a particular service.[45]

> An inventive system and method arrange for prepayment by a customer of a predetermined sum for *indicia such as a one-time-use gift ticket*.[46]

---

[44] '949 patent, 2:33-37 (emphasis added).

[45] *Id.*, 1:16-25 (emphasis added).

[46] *Id.*, 3:39-41 (emphasis added).  When discussing the prior art, and contrasting that art from the invention of the '949 patent, the specification also uses the non-specific term "gift indicia."  *See, e.g., id.*, 1:62-67 ("One example is *a vendor's prepaid gift indicia*, which can take various forms ranging from an authorized numbered slip bearing the vendor's name and a dollar amount to plastic cards bearing the vendor's logo and having a magnetically readable strip with a predetermined dollar value, each

The court, therefore, disagrees with TPG's contention that "payment mode" and "ticket" must be construed to have the same meaning.

The court also disagrees with TPG that either "payment mode" or "ticket" must be defined as having "no fixed monetary value to the user."  TPG points to, among other sections of the specification, the statement that "the gift ticket represents credit for a service and not a monetary value to the users"[47] as support for its position.  Claim 1 of the '949 patent recites "[a] method for providing a payment mode for services, comprising" a series of steps.[48]  Neither the claim or the specification compel inclusion of "no fixed monetary value to the user" into a claim broadly directed at "[a] method for providing a payment mode for services."[49]  Similarly, the court is unconvinced that the proper construction of "payment mode" or "ticket" must include "is sold to a customer."  That a "payment mode" or "ticket" may, indeed, be sold to a customer does not require narrowing the broad claims to include that requirement.

The court also disagrees with Quantum's proposal that the definition of "payment

---

redeemable at the vendor's sales outlets.") (emphasis added); *id.*, 1:67-2:6 ("*A prepaid gift indicia* is generally issued by a particular retailer and can only be redeemed at that retailer's facilities.  In this situation, the person who purchases *the gift indicia* may exercise a degree of choice, but the person who redeems it (typically the recipient of the gift) has no choice except to use the issuing retailer as the provider.") (emphasis added); *id.*, 2:10-15 ("It is conceivable that the issuer/provider may include a premium or discount to encourage patronage and/or purchase of *gift indic[i]a*, but within the control of the issuer/provider, the goods or services are provided in exchange for an amount that is related to the issuer/provider's pricing schedules.") (emphasis added); *id.*, 6:43-53 ("In this exemplary illustration of the invention, plural service providers 80 all provide at least one same stated service or article of goods . . . .  A broad network of providers of like services who accept the one-time-use ticket improves the marketability of the ticket, since the ability for the user to select among a variety of convenient providers is a desirable feature and one which differentiates *the ticket in the present invention from ordinary gift cards or other indicia* redeemable only at the retailers from whom it was purchased.") (emphasis added).

[47] *Id.*, 12:21-22.

[48] Claim 1 of the '294 patent similarly provides for "[a] method for provision of prepaid services" comprising a series of steps.

[49] The court similarly rejects each of TPG's proposed constructions to the extent they include "non-monetary ticket / non-monetary value."

mode" must include "excluding payment by check."  As support for the part of its

proposed construction, "but excluding payment by check," Quantum notes the

requirement of claim 1 that "*at the selected service provider, debiting a price* set by the

selected service provider for the desired service."  Quantum argues in "check-based

payment systems, money is not debited at the time the user presents the check to the

service provider.  At the time of the invention, checks were manually processed, and the

payment process was initiated when the service provider deposited the check at the

bank."[50]  Quantum supports that assertion with extrinsic testimony from third-party fact

witness Gary Palmer.

Palmer's testimony need not be considered as the patent itself demonstrates

electronic transmission of data is not required in claim 1.  Quantum notes the

specification explains when "a ticket user presents the ticket to a service provider," data

is transferred over a communications network and that "[b]y communicating with the

service provider that the ticket is valid, the ticket information manager basically indicates

that the ticketing program manager *will remit payment* to the service provider the

purchase price of the service for which the ticket user has presented the ticket."[51]  The

specification also states the system may use "an existing communication network, which

advantageously is a network that processes credit cards . . . .  [However,] [o]ther types of

communication devices may be used instead. . . .  For example, ticket information can be

transmitted . . . by telephone . . . ."[52]  This statement indicates information may be

---

[50] D.I. 294 at 6.
[51] '949 patent 10:33-11:31 (emphasis added); *see also id.*, 5:46-48 ("[U]nlike a typical sales transaction, however, a charge is not debited against the user's account, but instead, is debited against an account held by the ticketing program manager.").
[52] '949 patent, 9:7-20.

communicated via other than a communications network, here a telephone.

Additionally, as TPG points out, dependent claim 4 adds a limitation requiring data transfer over a communications network, a limitation not found in independent claim 1 that should not be imported into claim 1 under the doctrine of claim differentiation.

> Claim 4:  The method of claim 1, wherein *the payment mode is configured for data transfer over a communications network* capable of recognizing the unique identifier, the communications network including any of a credit card network, a debit network, and a financial transaction network.

The doctrine of claim differentiation suggests the data transmission recited in claim 4 is not an element of claim 1.[53]  Although data transmission is arguably not the only meaningful difference between claims 1 and 4, claim 1 does not specify the "debiting a price" element occurs via data transmission, and the court declines to import that limitation from the specification.

Based on the language of the claim and specification, the court construes "payment mode" to mean "an indicia of value that is redeemable for services."  After probing counsel at the *Markman* hearing on the distinction between "payment mode" and "ticket," the court agrees with Quantum that the former is a broader concept and a reasonable distinction between the terms is "payment mode" could be intangible whereas "ticket" is a tangible item.  Based on that understanding, the court construes "ticket" to mean "an item that is redeemable for services."

2.	*service* ('949 patent, claims 1-3, 9)

---

[53] *See, e.g., SunRace Roots Enter. Co., Ltd. v. SRAM Corp.*, 336 F.3d 1298, 1302-03 (Fed. Cir. 2003) (under the doctrine of claim differentiation, a limitation from a dependent claim should not be read into an independent claim, especially when the limitation in dispute is the only meaningful difference between an independent and dependent claim) (citing *Ecolab, Inc. v. Paraclipse, Inc.*, 285 F.3d 1362, 1375-76 (Fed. Cir. 2002)).

14

Quantum's proposed construction is:  "an intangible commodity, e.g., the showing of a movie."

TPG's proposed construction is:  "work performed by one who serves."

Each party supports its proposed construction with definitions from extrinsic sources.  Quantum relies on a definition of "service" found in an online version of *The Economist* magazine,[54] whereas TPG relies on a definition found in an online version of the *Merriam-Webster* dictionary.[55]  In *Phillips*, the Federal Circuit clarified the use of dictionaries in claim construction:

> In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.  In such circumstances, general purpose dictionaries may be helpful.  In many cases that give rise to litigation, however, determining the ordinary and customary meaning of the claim requires examination of terms that have a particular meaning in a field of art.[56]

"Service," in the context of the '949 patent, is not a word having a particular meaning in the field of art covered by the patent.  Indeed, TPG avers "[t]he term 'service' is a simple word, with a plain and unambiguous meaning, i.e. work performed by others."[57]

TPG criticizes Quantum's proposed construction, including "intangible commodity," as complicating an otherwise uncomplicated term.  The court disagrees, the specification recites "[t]he system and method are particularly applicable to personal services, entertainment services and similar quantifiable services, e.g., a movie pass (at any participating theater), a round of golf (at any participating golf course), a spa

---

[54] D.I. 295, Ex. G.
[55] D.I. 293, Ex. B.
[56] *Phillips*, 415 F.3d at 1314.
[57] D.I. 292 at 9.

treatment (at any participating spa), etc."[58]  As Quantum points out, each of those

services is an example of an intangible experience.[59]  Also, the same dictionary cited in

support of TPG's proposed construction also defines "service" as "useful labor that does

not produce a tangible commodity."[60]

Consequently, the court construes "service" to mean "an intangible commodity,

such as, the showing of a movie, a round of golf, a spa treatment, etc."

3.    *service specific payment mode* ('949 patent, claim 1); *service specific ticket* ('294
      patent, claim 1)

Quantum's proposed construction for "service specific payment mode is:  "a

payment mode for use for a specific type of service, e.g., a movie showing; e.g., 'a round

of golf, a day's worth of skiing or treatment at a health spa or the like.'"  It similarly

proposes construing "service specific ticket" to mean:  "a ticket that is intended to be

used for a specific type of service, e.g., a movie showing; e.g., 'a round of golf, a day's

worth of skiing or treatment at a health spa or the like.'"

TPG's proposed construction for "service specific payment mode" is:  "a 'payment

mode' which can only be used for a specified type of service.  (It is 'configured' that

way)."  It likewise proposes construing "service specific ticket" to mean "a non-monetary

ticket that can only be used for a specified type of service."

At the *Markman* hearing, Quantum stated the primary distinction between the

respective constructions was the inclusion of the word "only" in TPG's definition.[61]  In

---

[58] '949 patent, 3:45-50.
[59] D.I. 294 at 7.
[60] D.I. 293, Ex. B at 2.
[61] *See, e.g.*, Tr. 75:24-76:2 ("The word 'only' [in TPG's proposed construction] is a problem.  This whole argument comes down to the word 'only.'"); Tr. 79:17-23 (Quantum comparing the proposed constructions and concluding TPG's inclusion of the word "only" is what differentiates the parties'

briefing, Quantum argued if 100 payment modes were provided and 95 are used for a similar service while only 5 are used for something different, the payment mode is nevertheless service specific.[62] At the *Markman* hearing, Quantum gave as an example a user presenting a payment mode for a movie admission, either inadvertently or with fraudulent intent, at a coffee shop and receiving a free cup of coffee. In that example, Quantum contends the payment mode is still service specific because it was intended to be used for a movie admission even though it was redeemed for a cup of coffee.[63]

The court is unpersuaded by Quantum's argument. With regard to the coffee shop example, it is not clear how that transaction would be covered by the claim as the coffee shop would not be among the service providers of movies in the payment mode network and the program manager would not effect payment to the shop. This is shown by the specification's statement that after a payment mode is presented to the service provider, the ticket information manager will not approve the transaction if the service provider is not in the network of agreed service providers:

> A similar message [indicating that the ticket is not valid and that the service provider should not accept the ticket as payment for services] would result if, at step 152, the ticket information manager does not recognize the service provider as one who has agreed to participate in the prepaid leisure activity services system.[64]

Moreover, if 95 out of 100 payment modes were redeemed for their intended use and were, therefore, service specific, the converse could seemingly occur; only 5 of 100 payment modes could be redeemed for the intended use. The court finds it difficult to

---

definitions).
[62] D.I. 299 at 10.
[63] Tr. 75:3-18.
[64] '949 patent, 11:51-60.

characterize such a situation as involving service specific payment modes.

In briefing, Quantum stressed the specification's permissive description of the payment mode as support for its contention that the specification and claim explain how the payment mode *can be* used.  For instance, claim 1 provides the payment mode possesses "a substantially unique identifier" and "represent[s] an initial value *to be remitted* for use of a desired service . . . ."[65]  Quantum also cites the specification's description of the Field of Invention and examples of the claimed method as demonstrating the permissive nature of how the payment mode can be used.

> The invention relates to marketing and distributing services, especially participatory sport or entertainment services, by collecting a prepayment and issuing to a customer a ticket or similar indicia that *can be redeemed* for a particular service.[66]

> A ticket user presents the ticket to a service provider in order to redeem the indicated service. . . .  If the ticket code is valid and the ticket has not yet been used, the ticket information manager returns a message to the service provider . . . that the ticket is valid, *indicating that the user may redeem a single use of the service provider's services*, such as the aforementioned round of golf, day of skiing or treatment at a health spa or the like.[67]

Notwithstanding those citations, the court agrees with TPG that the phrase "service specific payment mode" means the "payment mode" can only be used for a specific service, e.g. a payment mode designated for use for a movie admission is "service specific" in that it can only be used for that specified service, a movie admission. The specification supports that plain reading.  The Abstract states "[t]icket-holders present the ticket for redemption of *the particular service* from an agreed service

---

[65] *Id.*, claim 1 (emphasis added).
[66] *Id.*, 1:16-20 (emphasis added).
[67] *Id.*, 10:33-64 (emphasis added).

provider."[68]  In summarizing the invention, the specification recites:

> An inventive system and method arrange for prepayment by a customer of a predetermined sum for indicia such as a one-time-use gift ticket.  The ticket is redeemable for *a particular incremental quantity of services*, as opposed to a cash value.  The ticket is redeemable at any of a *plurality of different providers* that offer services *that might be more or less similar* but that qualify as *the stated sort of services*. The system and method are particularly applicable to personal services, entertainment services and similar quantifiable services, e.g., *a movie pass* (at any participating theater), *a round of golf* (at any participating golf course), *a spa treatment* (at any participating spa), etc.[69]

The invention, therefore, contemplates a customer receiving a payment mode redeemable for a particular service from a plurality of providers supplying similar kinds of services, e.g., movies, golf, or spa treatments, not that a payment mode for a movie is intended to be used for a movie but could, nevertheless, be used for a round of golf, or a cup of coffee.  The specification explains "[t]he gift ticket issuer enlists a number of *suppliers of services* to be obtained by redemption of the ticket for services, *each having* offerings that have *character*, terms and pricing arrangements that are approximately equal but may differ up to some threshold."[70]  It is reiterated "[g]ift tickets each contain a unique identification code and are loaded with a predetermined value identified as a one-time use at any customer-chosen one of the service providers who have agreed to participate and who provide the pertinent goods or services *that are identified when the ticket is sold*."[71]  The particularity of the service associated with individual payment modes is repeated throughout the specification.[72]  Additionally, the patent distinguishes

---

[68] *Id.*, Abstract (emphasis added).
[69] *Id.*, 3:39-50 (emphasis added).
[70] *Id.*, 3:52-57 (emphasis added).
[71] *Id.*, 4:17-22 (emphasis added).
[72] *See, e.g., id.*, 4:48-50 ("The gift ticket holder presents the ticket for redemption *of the particular service* from one of a plurality of agreed service providers.") (emphasis added); *id.*, 4:63-5:8 ("With the capability of adding an incremental value, it is possible to apply the invention to *services of a given kind*

prior art gift cards, which "leav[e] it to the consumer to decide *where to expend the gift ticket*, either wholly or in a successive number of transaction . . . ."[73]

Consequently, the court construes "service specific payment mode" as meaning "a payment mode which can only be used for a specified type of service" and "service specific ticket" to mean "a ticket which can only be used for a specified type of service."

4.    *substantially unique identifier* ('949 patent, claim 1)

Quantum's proposed construction is:  "an indicia, such as a number, that distinguishes one payment mode from other payment modes; common examples include a 16-digit number characteristic of a credit or debit card or code."

TPG's proposed construction is:  "a code which uniquely identifies an individual non-monetary ticket, and is not an ordinary credit card number."

In its rebuttal brief, TPG states:

The only dispute about [this term] is whether it has to be a 16-digit number. Although Quantum's proposed construction does not expressly limit the identifier to a 16-digit number, by providing the 16-digit number as the only example, the jurors may be misled into believing that anything other than a

---

*(such as a round of golf, for example)* that have more than some predetermined threshold difference in value that prevents them from being peers. . . .  The customer can purchase an upgrade . . . if desired, to the higher quality level *in the same category of 'a round of golf' . . . .*") (emphasis added); *id.*, 5:26-30 ("It is an aspect of the system and method that the purchase price of the gift ticket is fixed, but the ticket holder can redeem the ticket at any of *a plurality of providers of a given service*, even though the service providers may normally assess different prices.") (emphasis added); *id.*, 6:12-18 ("[A] ticketing program manager . . . enlists a plurality of providers 80 of one or more *substantially comparable services*.") (emphasis added); *id.*, 6:53-46 ("In this exemplary illustration of the invention, plural service providers 80 *all provide at least one same stated service or article of goods*, for example a round of golf, a day's worth of skiing *or* treatment at a health spa *or* the like.") (emphasis added); *id.*, 6:53-64 ("It is also expected that the various providers will provide somewhat different services and may assess different charges, up to a threshold of difference within which *the providers are considered to provide the 'same' service as authorized and redeemable by presenting the one time use gift ticket.  Therefore, while *the particular service for which a ticket is to be used is nominally the same service for that series of ticket (i.e. for tickets sold for redemption for a uniquely named or described service)*, the service providers need not all agree to provide identical services or to charge a dictated price for their services.") (emphasis added); *id.*, 10:33-34 ("A ticket user 35 presents the ticket to a service provider at step 150 in order to redeem *the indicated service.*") (emphasis added).
    [73] *Id.*, 2:62-64.

16-digit number cannot be a "substantially unique identifier." Therefore, the 16-digit number example should be excluded from the construction.[74]

The court agrees with TPG's concern over Quantum's inclusion of "a 16-digit number" as an example in its proposed construction.

At the *Markman* hearing, TPG appended its original proposed construction, "a code which uniquely identifies an individual non-monetary ticket" to read "a code which uniquely identifies an individual non-monetary ticket, *and is not an ordinary credit card number*." As support for that additional language, TPG points to the specification's statement:

> If the communications network is one that is maintained by a credit card provider, the credit card provider's equipment would recognize the unique identification code as being *not an ordinary credit card* but a onetime-use ticket and would contact the ticket information manager to perform verification of both the service provider's inclusion in the program and the validity of the individual ticket.[75]

That language, however, simply states that the unique identification code permits a credit card provider to distinguish a payment mode from an ordinary credit card, i.e., the payment mode is not a Visa credit card, for instance. Therefore, the court rejects TPG's suggestion that this term be construed to include "and is not an ordinary credit card number."

Because TPG stated its only other concern with the construction of this term was whether "16-digit number" should be included in the definition, the court construes "substantially unique identifier" to mean: "an indicia, such as a number, that distinguishes one payment mode from other payment modes."

---

[74] D.I. 299 at 12.
[75] '949 patent, 10:37-41.

5.    *initial value / representing an initial value to be remitted* ('949 patent, claim 1)

Quantum contends no construction of "initial value" is necessary other than defining the meaning of the phrase of which it is a part, "representing an initial value to be remitted."  Quantum's proposed construction of the entire phrase is:  "an amount for which the payment mode is initially valued, such as from a ticket information manager's perspective, 'the actual monetary value that has been purchased,' or from a user's perspective, some incremental unit for an experience or service."

TPG's proposed construction of "initial value" is:  "the first value which is not stated in monetary terms."  TPG contends no construction of "representing an initial value to be remitted" is necessary and "remit" means "submit."

TPG argues the phrase "representing an initial value to be remitted," "is incomplete because it omits the predicate 'substantially unique identifier' . . . ."[76]  The court disagrees.  That phrase is part of the limitation "providing service specific payment modes, each payment mode possessing a substantially unique identifier *and* representing an initial value to be remitted . . . ."[77]  Therefore, "each payment mode possess[es] a substantially unique identifier" and "each payment mode . . . represent[s] an initial value to be remitted . . . ."[78]  The court construed, above, the "substantially unique identifier" possessed by each payment mode.  "Substantially unique identifier," therefore, does not need to be incorporated into the construction of "an initial value to be remitted" represented by each payment mode.

Unasserted claim 5 provides guidance on the definition of "initial value" reciting:

---

[76] D.I. 292 at 12.
[77] '949 patent, claim 1 (emphasis added).
[78] *Id.*

5.  The method of claim 1, wherein the payment mode is a one-time use payment mode; and

further comprising permitting optional purchase of additional incremental value above a *base value* on the payment mode . . . .[79]

The specification explains that the "base value" of claim 5 refers to the "initial value" recited in claim 1.

In the case where a ticket can have additional *incremental value added*, part of step 153 would include not only verifying that the ticket is valid, but determining *the total value of the ticket*.  Again, *the ticket's value as seen by a user is not intended to be in monetary units*, but *incremental credits*.  For example, *a ticket may be initialized with one credit at time of sale (a base value)*, and be valid for a single use at all service providers who accept the base value.  Additional credits can be fractions of the base value.  For example, additional increments might be one quarter of *the initial value*.  A user can then purchase four additional increments to take a guest if that is a feature of the system, or might purchase only the number of incremental credits to be able to use the ticket at a service provider who does not accept *the base value of the ticket*.  In this embodiment of the invention, the service provider will verify the ticket's validity and its value at time of redemption.  Because the ticket is a one-time-use ticket, *any additional value on the ticket that exceeds that needed for the user to redeem the service will be lost to the user*.[80]

Thus, the "initial value" is the "base value."  The "base value" is "valid for a single use at all service providers who accept the base value."  The court, therefore, construes "initial value" to mean "base value" and "representing an initial value to be remitted" to mean "the base value of one unit of service to be presented for that service."

6.  *configured to be valid for incremental quantity of services* ('949 patent, claim 1)

Quantum's proposed construction is:  "the payment mode is redeemable for a whole unit of a service or experience as opposed to a cash value."

TPG's proposed construction is:  "set up for operation only in a particular way with

---

[79] *Id.*, claim 5 (emphasis added).
[80] *Id.*, 14:38-57 (emphasis added).

a unique code which restricts use to only a whole unit of a specified service."

The parties' constructions demonstrate agreement that this term means the payment mode is redeemable for a whole unit of service.  Consistent with the court's construction of "service specific payment mode" as meaning "a payment mode which can only be used for a specified type of service" and the construction of "at any one of a plurality of service providers" as meaning "payment modes are only accepted by service providers participating in an enlisted network," the court adopts TPG's proposed construction of this term, as modified by the court, and defines "configured to be valid for incremental quantity of services" to mean "set up for operation only in a particular way with a substantially unique identifier which restricts use to only a whole unit of a specified service."

7.      *at any one of a plurality of service providers* ('949 patent, claim 1)

Quantum contends no further construction is necessary other than the construction of "plurality" and "service providers."  According to Quantum, a "service provider" is simply "a provider of services" and a "plurality" of "service providers" should be accorded its ordinary meaning of "two or more" service providers who provide more or less similar services.[81]

TPG's proposed construction is:  "non-monetary tickets are only accepted by service providers participating in an enlisted network."

The parties agree that "plurality" means "two or more."  The court agrees with

_____

[81] *See, e.g., id.*, 3:43-50 ("The ticket is redeemable at any of a plurality of different providers that offer services that might be more or less similar but that qualify as the stated sort of services.  The system and method are particularly applicable to personal services, entertainment services and similar quantifiable services, e.g., a movie pass (at any participating theater), a round of golf (at any participating golf course), a spa treatment (at any participating spa), etc.").

TPG that the service providers must be among those who have agreed to participate in

the program and provide services in exchange for a payment mode.  The specification

supports TPG's position, stating:

> The gift ticket issuer *enlists a number of suppliers of services* to be
> obtained by redemption of the ticket for services, each having offerings that
> have character, terms and pricing arrangements that are approximately
> equal but may differ up to some threshold.  *Enlisted service providers*
> agree to participate in the program and agree to accept the prepaid gift
> ticket as a payment method.[82]
>
> [A] ticketing program manager 95 desiring to implement the one-time-use
> gift ticket system of the invention . . . *enlists a plurality of providers 80* of
> one or more substantially comparable services.[83]
>
> It is advantageous for the ticketing program manager who *enlists the
> service provider* to bring the provider on as a member of a common group
> enterprise . . . .[84]

The specification continues, noting, "[a]s a first check the ticket information manager will

verify that the service provider is among those who have agreed to accept the tickets."[85]

If "the service provider is not listed in the ticket information manager's inclusion table," a

message would be "returned to the service provider indicating that the ticket is not valid

and the service provider should not accept the ticket as payment for services."[86]

Consequently, the court construes "at any one of a plurality of service providers"

to mean "payment modes are only accepted by service providers participating in an

enlisted network."

8.      *enabling / enabling a variable rate redemption of the payment mode / payment
        mode is redeemable at a variable rate* ('949 patent, claim 1); *redeemable* ('949

---

[82] *Id.*, 3:52-59 (emphasis added).
[83] *Id.*, 612-18 (emphasis added).
[84] *Id.*, 6:25-27 (emphasis added).
[85] *Id.*, 10:44-47.
[86] *Id.*, 11:51-61.

patent, claims 1, 2, 3)

Quantum's proposed construction of "enabling" is:  "permitting."  It contends "enabling a variable rate redemption of the payment mode" and "payment mode is redeemable at a variable rate" are defined by the claim itself; no further construction is necessary.  Quantum defines "redeemable" as "capable of being redeemed" and that "redeem" means "to exchange for."

TPG contends "enabling" does not require construction.  Its proposed construction for "enabling a variable rate redemption of the payment mode / payment mode is redeemable at a variable rate" is:  "making it possible for non-monetary tickets to be accepted by all participating service providers for a given service regardless of whether the price charged for the service is higher or lower than the ticket purchase price."

In the JCCC, TPG stated it would not propose a construction for "redeemable" "because this term is not within the 50 terms proposed by Quantum pursuant to the Court's Order";[87] but, in its responsive claim construction brief, it averred "[t]here is no dispute as to the meaning of 'redeemable.'  'Redeemable' means 'capable of being exchanged for.'"[88]  The parties are, therefore, in agreement as to the meaning of "redeemable," and the court construes that term to mean "capable of being exchanged for."

TPG contends "enabling" does not mean "permitting" as Quantum proposes. Instead, it argues "[t]o enable is to provide the means to permit something to happen."[89] In briefing, TPG proposed construing the entire phrase "enabling a variable rate

---

[87] D.I. 245 at 20.
[88] D.I. 301 at 16.
[89] *Id.* at 15.

redemption of the payment mode," to mean "*allowing* non-monetary tickets to be accepted . . . ."  The court notes that "permit" and "allow" are synonyms.  In the parties' August 15, 2012 submission, TPG altered its proposed construction to "*making it possible for* non-monetary tickets to be accepted . . . ."  The court does not see a significant difference in "permitting," "allowing," and "making it possible."  Indeed, in arguing for its initial construction, "*allowing* non-monetary tickets to be accepted," TPG used the same language it now includes in its altered construction, when it stated "Quantum's argument that 'enabling' is a permissive term is incoherent.  Enabling quite clearly requires affirmative action *to make something possible*, in this case, variable rate redemption."[90]  Consequently, the court construes "enabling" to mean "permitting."

Quantum contends no construction is necessary for "enabling a variable rate redemption of the payment mode / payment mode is redeemable at a variable rate" because "variable rate redemption" is defined by the claim itself.  The pertinent part of claim 1 recites:

> (b) enabling a variable rate redemption of the payment mode for service provided by one of the plurality of service providers, by:
>
> > allowing a user to select one of the service providers among the plurality of service providers for redemption in exchange for a unit use of a desired service from said selected provider;
> >
> > at the selected service provider, debiting a price set by the selected service provider for the desired service, wherein price debited for said service by at least certain of said service providers being able to be different from price debited by others of said service providers for similar service, such that the payment mode is redeemable at a variable rate among the plurality of service providers for similar service; and

---

[90] *Id.* at 15-16 (emphasis added).

effecting payment at the price debited for said service by said selected service provider.[91]

The court disagrees with Quantum's contention that "enabling a variable rate redemption of the payment mode / payment mode is redeemable at a variable rate" does not need to be construed. The claim recites "enabling a variable rate redemption of the payment mode . . . by . . ." and then includes three sub-paragraphs explaining "variable rate redemption of the payment mode." Within those sub-paragraphs, there are several other terms separately construed. "[P]ayment mode is redeemable at a variable rate" is in the second sub-paragraph of the three sub-paragraphs that Quantum contends is the proper construction. As there is no real dispute as to the meaning of "redeemable," and an insignificant dispute regarding "enabling," the parties' primary disagreement concerning these terms is the meaning of redeeming a payment mode at a "variable rate."

The phrase "variable rate redemption" is not used in the specification. The language of claim 1 provides guidance as to the term's meaning, however, stating the "price debited for said service by at least certain of said service providers being able to be *different from* price debited by others of said service providers for similar service, *such that the payment mode is redeemable at a variable rate* among the plurality of service providers for similar service."[92] Thus, claim 1 speaks of redeeming a payment mode for a specified service from similar service providers who charge varying amounts for their services. "[W]hether the price charged for the service is higher or lower than *the ticket purchase price*," as TPG's proposed construction recites, is not relevant to the

---

[91] '949 patent, claim 1.
[92] *Id.*, claim 1 (emphasis added).

claim's requirement that at least some of the similar service providers charge different prices from other similar service providers.  The specification supports that distinction.

Although the patent's Abstract states "service providers will receive their agreed payment price from the ticketing program manager's account when a ticket user redeems a ticket regardless of whether that price is higher or lower than the ticket purchase price,"[93] the comparison of the payment mode price to the price charged by the service provider is not the "variable rate redemption" recited in the claim.  With regard to pricing among similar service providers, the specification states "the ticket represents the ability to redeem a service from agreed providers regardless of the cost of that service"[94]

> It is an aspect of the invention that the gift ticket carries information and functions as a means for the user to obtain and remit for an incremental service, as opposed to an incremental sum of money.  The various service providers may actually charge different amounts for services . . . .  From the user's standpoint, the system treats the ticket as the means to provide an increment of services . . . apart from these pricing considerations, which is advantageous.[95]

The specification reiterates "the purchase price of the gift ticket is fixed, but the ticket holder can redeem the ticket at any of a plurality of providers of a given service, even though the service providers may normally assess different prices."[96]

Based on the language of the claim, and support from the specification, the court

---

[93] *Id.*, Abstract.
[94] *Id.*, 12:51-52.
[95] *Id.*, 11:62-6, 12:2-5.
[96] *Id.*, 5:26-30; *see also id.*, 3:51-59 ("The providers are independent entities that determine the nature of their own offerings and set their own prices.  The gift ticket issuer enlists a number of suppliers of services to be obtained by redemption of the ticket for services, each having offerings that have character, terms and pricing arrangements that are approximately equal but may differ up to some threshold. Enlisted service providers agree to participate in the program and agree to accept the prepaid gift ticket as a payment method."); *id.*, 6:53-58 ("It is also expected that the various providers will provide somewhat different services and may assess different charges, up to a threshold of difference within which the providers are considered to provide the 'same' service as authorized and redeemable by presenting the one time use gift ticket.").

construes "enabling a variable rate redemption of the payment mode" to mean:

"permitting a payment mode to be exchanged for a service from providers of similar

services regardless of the price those service providers charge for the service."  The

court construes "payment mode is redeemable at a variable rate" to mean:  "payment

mode is capable of being exchanged for a service from providers of similar services

regardless of the price those service providers charge for the service."

9.      *for redemption in exchange for a unit use of a desired service* ('949 patent, claim
        1)

        Quantum's proposed construction is:  "the provision of one whole unit of service,

e.g., admission to a movie."

        TPG's proposed construction is:  "non-monetary tickets may be used only once

and only in return for a given service."

        With the exception of "non-monetary tickets" the court agrees with TPG's

proposed construction.  "Service specific payment mode" has been construed to mean "a

payment mode which can only be used for a specified type of service."  TPG's

suggestion of "only in return for a given service" comports with that construction.  The

court also agrees the patent describes, and claims, a one-time use ticket.  "Redeemable"

has been construed as meaning "capable of being exchanged for," as proposed by

Quantum.  The court agrees with TPG that a ticket which has been redeemed, or

exchanged for a service, cannot be used again by the same end user.  The specification

also supports TPG's position.

> [A] ticket may be initialized with one credit at time of sale (a base value),
> and be valid for *a single use* at all service providers who accept the base

value.[97]

[If the ticket is valid,] the user may redeem *a single use* of the service provider's services . . . .[98]

Gift tickets . . . are loaded with a predetermined value identified as a one-time-use at any customer-chosen one of the service providers who have agreed to participate and who provide the pertinent . . . services that are identified when the ticket is sold.[99]

Consequently, the court construes "for redemption in exchange for a unit use of a desired service" to mean "payment modes may be used only once and only in exchange for a specified type of service."

10.   *at the selected service provider, debiting a price set by the selected service provider / effecting payment / effecting payment at the price debited* ('949 patent, claim 1)

In briefing, Quantum proposed the same construction for all three of these terms: "transferring information concerning payments, including credits and debits relating to the price charged by the service provider, such as the cost of admission to a movie, to another account or about another account."  In the parties' August 15, 2012 submission, Quantum slightly modified is proposed construction.  Now Quantum proposes construing "at the selected service provider, debiting a price set by the selected service provider" to mean "transferring information concerning payments, such as debiting or charging, including credits and debits, to another account or about another account."

TPG's proposed construction for "at the selected service provider, debiting a price

---

[97] '949 patent, 14:43-45 (emphasis added).

[98] *Id.*, 10:61-62 (emphasis added).

[99] *Id.*, 4:17-22; *see also id.*, Abstract ("One-time-use tickets containing a unique identification, code that allow for prepayment of entertainment or personal services are distributed and sold."); *id.*, 10:64-67 ("The ticket information manager then records data referenced to the ticket code to represent that the ticket has been used, so that the ticket may not be used validly again."); *id.*, 14:54-57 ("Because the ticket is a one-time-use ticket, any additional value on the ticket that exceeds that needed for the user to redeem the service will be lost to the user.").

set by the selected service provider" is:  "a participating service provider reports that non-monetary tickets have been used for a given service at a certain price."

TPG's proposed construction for "effecting payment / effecting payment at the price debited" is:  "transferring the agreed upon price of the service to the service provider."

Although Quantum slightly modified its construction of "at the selected service provider, debiting a price set by the selected service provider," the court views that modified construction as an equivalent to its "effecting payment at the price debited" construction.  The court first notes, contrary to Quantum's proposals, the terms should have separate constructions as they are distinct phrases and each are in separate sub-paragraphs of the "enabling a variable rate redemption" step in claim 1.[100]  Next, Quantum's proposed constructions rest on its contention that the claim requires data transfer of information.  The court rejected that contention in its discussion of "payment mode" and, for the same reasons, that contention is again rejected.

The court views these terms as relatively straightforward.  The court agrees with TPG that "at the selected service providers, debiting a price set by the selected service provider" means "a participating service provider reports that a payment mode has been used for a given service at a certain price."  When a payment mode is presented to the service provider by the user, the service provider verifies the validity of the payment mode with the ticket information manager who "records data referenced to the ticket

---

[100] *See, e.g., Flex-Rest, LLC v. Steelcase Inc.*, 455 F.3d 1351, 1361-62 (Fed. Cir. 2006) (stating that "every limitation of a claim is material") (citing *Warner-Jenkinson Co v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997) ("Each element contained in a patent claim is deemed material to defining the scope of the claimed invention . . . .")).

code . . . ," and the "service provider . . . report[s] to the ticket information manager that a particular service is being redeemed . . . ."[101]  According to TPG, this is the only description in the patent of what happens at the service provider after the payment mode is presented; the only act that occurs "at the service provider" is noting or recording the transaction and claim 1 does not state an "account" is debited.  In fact, there are no accounts "at the service provider" that may be debited.  The court agrees with TPG, therefore, that this term can only mean an accounting entry is made in the books or records of the service provider.  Consequently, the court construes "at the selected service provider, debiting a price set by the selected service provider" to mean "a participating service provider reports that a payment mode has been used for a given service at a certain price."

Similarly, the court agrees with TPG that "effecting payment / effecting payment at the price debited" means "transferring the agreed upon price of the service to the service provider."  TPG criticizes Quantum's proposed construction as seeking to limit the term to the transfer of information concerning payments rather than actual payment.  TPG contends the patent clearly contemplates that the service provider will be paid.  Supporting language from the specification recites:

> The service providers are credited in the redemption process with their agreed payment price from the ticketing program manager, so that the provider is *paid* in a normal manner when a ticket user redeems a ticket for a service.[102]

> By communicating to the service provider 80 that the ticket is valid, the ticket information manager 70 basically indicates that the ticketing program manager 95 will *remit payment* 81 to the service provider 80 the purchase

---

[101] '949 patent, 10:64-66, 11:11-15.
[102] *Id.*, 5:30-34 (emphasis added).

33

price of the service for which the ticket user 35 has presented the ticket.[103]

If a credit card provider is serving as the financial network and the communications network, the ticket information manager can signal the credit card provider to release funds from an escrow account maintained for the ticketing program manager directly to the service provider's account.[104]

Finally, the ticket information manager sends a notification to the financial network that a ticket has been redeemed, at which point the financial network provider *transfers payment* 81 from the ticketing program manager's account to the service provider's account.[105]

Consequently, the court construes "effecting payment / effecting payment at the price debited" to mean "transferring the agreed upon price of the service to the service provider."

11.   *as opposed to a cash sum* ('949 patent, claim 2)

Quantum's proposed construction is:  "the payment mode is redeemable for a whole unit of service or experience, e.g., admission to a movie; users cannot exchange the payment mode for currency."

TPG's proposed construction:  "non-monetary tickets can be used only for the denominated service regardless of the price charged for the service; non-monetary tickets cannot be redeemed for a fixed monetary value, such as $12.00 off a specified service."

Dependent claim 2 recites:

The method of claim 1, wherein the payment mode is redeemable for a certain service from the selected service provider, *as opposed to a cash sum.*[106]

---

[103] *Id.*, 11:1-6 (emphasis added).
[104] *Id.*, 11:6-10.
[105] *Id.*, 11:15-19 (emphasis added).
[106] *Id.*, claim 2 (emphasis added).

TPG contends the payment mode may not be redeemed for a fixed monetary value, such as $12.00 off a specified service.  TPG argues during prosecution of the '373 patent, the parent of the '949 patent, was distinguished from prior art reference, U.S. Patent No. 5,903,633 to Lorsch, by the applicant urging his gift tickets "can be one round of golf valid in a plurality of golf courses, rather than, for example, a gift card of $25 which can be used at certain golf courses."[107]  TPG, therefore, maintains a ticket which is valid for $12.00 off a specified service, such as a movie admission, has been disclaimed by the applicant.

Quantum argues the passage cited by TPG is nothing more than what the patent already provides in the "Background of the Invention" section, which notes a problem with known gift cards is they are:

> generally issued by a particular retailer and can only be redeemed at that retailer's facilities.  In this situation, the person who purchases the gift indicia may exercise a degree of choice, but the person who redeems it (typically the recipient of the gift) has no choice except to use the issuing retailer as the provider.[108]

Quantum maintains the prosecution statement referenced by TPG does not operate to disclaim any claim scope.  The court agrees with Quantum.  Its explanation of that statement is reasonable and, moreover, that statement is not the clear disavowal of claim scope required by the Federal Circuit.[109]

---

[107] D.I. 245, Ex. 2 ('383 patent Prosecution History (Dec. 8, 2004 Amendment in response to Sept. 7, 2007 Office Action at 10)).

[108] '949 patent, 2:1-6.

[109] *See, e.g., Omega Eng'g Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325 (Fed. Cir. 2003) ("To balance the importance of public notice and the right of patentees to seek broad patent coverage, we have thus consistently rejected prosecution statements too vague or ambiguous to qualify as a disavowal of claim scope.  Rather, we have required the alleged disavowing statements to be both *so clear as to show reasonable clarity and deliberateness and so unmistakable as to be unambiguous evidence of disclaimer.*") (emphasis added) (internal citations omitted).

Quantum's proposed construction reflects the ordinary meaning of the disputed phrase and is consistent with the specification's indication that the payment mode is redeemable for an incremental quantity of services (i.e., a whole unit of service or experience):  "[t]he ticket is redeemable for a particular incremental quantity of services, as opposed to a cash value."[110]  Consequently, the court construes "as opposed to a cash sum" to mean "the payment mode is redeemable for a whole unit of service or experience; users cannot exchange the payment mode for currency."

12.    *absorbing any difference in prices / adjusting price of the payment mode* ('949 patent, claim 3)

Quantum's proposed construction of "absorbing any difference in prices" is: "bearing the risk."[111]  It proposes defining "adjusting price of the payment mode" to mean "changing the price."

TPG's proposed construction of "absorbing any difference in prices" is:  "taking in any differences in prices."  It proposes defining "adjusting price of the payment mode" to mean "changing the price of future non-monetary tickets to compensate for overpayments or underpayments of past non-monetary tickets."[112]

Dependent claim 3 recites:

The method of claim 1, further comprising the steps of *absorbing any differences in prices* debited by the plurality of service providers for similar service, and optionally *adjusting price of the payment mode* redeemable for

---

[110] '949 patent, 3:41-43; *id.* 11:62-65 ("It is an aspect of the invention that the gift ticket carries information and functions as a means for the user to obtain and remit for an incremental service, as opposed to an incremental sum of money.").

[111] In briefing, Quantum had suggested defining "absorbing any difference in prices" as meaning "paying for."  As a result of the court's discussion of this term during the *Markman* hearing, Quantum now proposes defining that term to mean "bearing the risk."

[112] TPG's proposed construction of "adjusting price of the payment mode" is found in the JCCC. D.I. 245 at 23-24.  It did not discuss this term in its claim construction briefs.

the service.[113]

The specification explains absorbing differences in prices and adjusting the price

of the payment mode as follows:

> At step 160, after the system has been in operation for some period of time, the ticketing program manager can compare and reconcile any overage/underage on proceeds received on tickets presented for higher or lower priced service providers and/or sold by sellers with higher or lower markups, and adjust pricing and payment strategies or provider membership arrangements, if necessary.  These differences are absorbed and averaged by the ticketing program manager, who can make certain decisions about how the system is run and priced.  For example, the ticketing program manager may decide based on experience to adjust the sale price of future tickets or may determine that certain sellers and/or providers will or will not become or remain active, competition and supply and demand causing the market to reach an equilibrium.[114]

> That is, the ticket selling price should be set and/or periodically adjusted so that the use of the tickets integrated over all the users and providers, has a sufficient surplus selling price over the average cost of the service (which may or may not be the same as the average provider price, given that users may frequent certain providers more than others), to provide at least a modest return on investment to the ticketing program manager.  The ticket selling price is determined so that any overage that accumulates when a ticket is used to obtain the service from providers whose services are priced at less than the ticket selling price is balanced against the shortfall that arises when a ticket is used to obtain the service from providers whose services are priced higher than the ticket selling price.[115]

The explanation of what the inventor meant by "absorbing any difference in

prices" is should the total amount paid to the service providers exceed the amount

received from the sale of payment modes for a specific service, e.g., entrance into a

movie, that loss would be bourn by ticket program manager.[116]  In other words, the ticket

---

[113] '949 patent, claim 3 (emphasis added).
[114] *Id.*, 12:5-21.
[115] *Id.*, 7:25-38.
[116] *See id.*, 12:5-14 (stating that after the "system has been in operation for some period of time, the *ticketing program manager* can compare and reconcile any overage/underage on proceeds received on tickets . . . [and] [t]hese differences *are absorbed* and averaged *by the ticketing program manager* . . . .") (emphasis added).

program manager would not seek a return of monies paid to service providers to cover that loss.  Quantum's proposed construction is consistent with that concept. Consequently, the court construes "absorbing any difference in prices" to mean "bearing the risk."

With the exception of the repetition of "non-monetary ticket," TPG's proposed construction of "adjusting price of the payment mode," i.e., "*changing the price* of future non-monetary tickets to compensate for overpayments or underpayments of past non-monetary tickets," is not substantially different from Quantum's.  TPG's proposal to include "Future . . . tickets" is unnecessary, as the existing payment modes have already been purchased/paid for so any adjustment in price is necessarily for future tickets. TPG's inclusion of "to compensate for overpayments or underpayments" is unnecessary verbiage not required by the claim language.  Consequently, the court construes "adjusting price of the payment mode" to mean:  "changing the price."

13.      *verifying an expiration date* ('949 patent, claim 9)

Quantum's proposed construction is:  "transmitting the expiration information to confirm the date on or after which a payment mode is no longer valid."

TPG's proposed construction is:  "establishing the date after which the payment mode is no longer valid."

Dependent claim 9 recites:

The method of claim 1, wherein the payment mode is valid for redemption for a limited period of time and further comprising the additional step of the service provider's *verifying an expiration date* of the payment mode.[117]

TPG states the parties do not dispute what "expiration date" means and that the

---

[117] *Id.*, claim 9 (emphasis added).

ordinary meaning of "verify" is "establishing."  Quantum counters TPG has not offered a

definition of "expiration date" with which it could agree or disagree.  Quantum also

disagrees that "verifying" means "establishing," insisting TPG's proposed construction

does not contemplate the nature of the transaction by which the expiration date is

established.  Quantum maintains its proposed construction is consistent with the

specification's discussion of verification through information transmission, citing the

example where:

> The service provider verifies the ticket's validity by checking with the ticket
> information manager that the ticket's unique identification code is valid and
> that the ticket has been activated, in a transaction that is much the same as
> a credit card authorization, which can use the same point of sale network
> communications as a credit card transaction.[118]

> At step 151, the service provider preferably verifies the validity of the ticket
> by data transfer with the ticket information manager 70 over the
> communications network 60.[119]

The court notes, contrary to Quantum's assertion, TPG has provided a definition

of "expiration date" in its proposed construction:  "the date after which the payment mode

is no longer valid."  "Expiration date" is not a term of art specific to the claimed invention.

The term is only used once in the specification:  "In an Internet based option, the user

can also use the Internet to simply verify ticket value or expiration date . . . ."[120]  TPG's

proposed construction is consistent with the ordinary meaning of the term.  Moreover,

Quantum's proposed construction incorporates its previously rejected contention that the

invention requires data transmission.

Although TPG suggests "*establishing* the date after which the payment mode is

---

[118] *Id.*, 4:52-58.
[119] *Id.*, 10:34-37.
[120] *Id.*, 13:65-66.

no longer valid" is the correct construction, the court believes that "confirming" more precisely reflects the meaning of "verifying" than "establishing.  Consequently, the court construes "verifying an expiration date" to mean:  "confirming the date after which the payment mode is no longer valid."

## V.    RECOMMENDED DISPOSITION

For the reasons set forth above, I recommend the disputed terms be construed as follows:

| Claim Term | Recommended Construction |
|---|---|
| payment mode ('949 patent, claims 1-4, 9) | an indicia of value that is redeemable for services |
| ticket ('294 patent, claims 1, 2) | an item that is redeemable for services |
| service ('949 patent, claims 1-3, 9) | an intangible commodity, such as, the showing of a movie, a round of golf, a spa treatment, etc. |
| service specific payment mode ('949 patent, claim 1) | a payment mode which can only be used for a specified type of service |
| service specific ticket ('294 patent, claim 1) | a ticket which can only be used for a specified type of service |
| substantially unique identifier ('949 patent, claim 1) | an indicia, such as a number, that distinguishes one payment mode from other payment modes |
| initial value ('949 patent, claim 1) | base value |
| representing an initial value to be remitted ('949 patent, claim 1) | the base value of one unit of service to be presented for that service |
| configured to be valid for incremental quantity of services ('949 patent, claim 1) | set up for operation only in a particular way with a substantially unique identifier which restricts use to only a whole unit of a specified service |
| at any one of a plurality of service providers ('949 patent, claim 1) | payment modes are only accepted by service providers participating in an enlisted network |

| Claim Term | Recommended Construction |
|---|---|
| enabling ('949 patent, claim 1) | permitting |
| redeemable ('949 patent, claims 1, 2, 3) | capable of being exchanged for |
| payment mode is redeemable at a variable rate ('949 patent, claim 1) | payment mode is capable of being exchanged for a service from providers of similar services regardless of the price those service providers charge for the service |
| enabling a variable rate redemption of the payment mode ('949 patent, claim 1) | permitting a payment mode to be exchanged for a service from providers of similar services regardless of the price those service providers charge for the service |
| for redemption in exchange for a unit use of a desired service ('949 patent, claim 1) | payment modes may be used only once and only in exchange for a specified type of service |
| at the selected service provider, debiting a price set by the selected service provider ('949 patent, claim 1) | a participating service provider reports that a payment mode has been used for a given service at a certain price |
| effecting payment / effecting payment at the price debited ('949 patent, claim 1) | transferring the agreed upon price of the service to the service provider |
| as opposed to a cash sum ('949 patent, claim 2) | the payment mode is redeemable for a whole unit of service or experience; users cannot exchange the payment mode for currency |
| absorbing any difference in prices ('949 patent, claim 3) | bearing the risk |
| adjusting price of the payment mode ('949 patent, claim 3) | changing the price |
| verifying an expiration date ('949 patent, claim 9) | confirming the date after which the payment mode is no longer valid |

Pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR

72.1, any objections to the Report and Recommendation shall be filed within fourteen

(14) days limited to ten (10) pages after being served with the same.  Any response shall be limited to ten (10) pages.

The parties are directed to the Court's Standing Order In Non-Pro Se Matters For Objections Filed Under Fed. R. Civ. P. 72, dated November 16, 2009, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.


September 11, 2012                                   /s/ Mary Pat Thynge
Wilmington, Delaware                                 Thynge, U.S. Magistrate Judge